**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **ANDREW H. WILLIAMS, et al.,** | * | |
| Plaintiffs | * | |
| v. | * | Case number: 07cv2341 RWT |
| **MELANIE SENTER LUBIN**, Securities Commissioner of Maryland, | * | |
| Defendant | * | |

**MEMORANDUM OPINION**

This case arrives at this Court in the midst of an ongoing administrative proceeding before the Maryland Securities Commissioner, Melanie Senter Lubin ("Securities Commissioner"). In their September 4, 2007, Complaint and Motion for Temporary Restraining Order, Plaintiffs request that this Court enjoin the Securities Commissioner from enforcing a Summary Order to Cease and Desist ("Cease and Desist Order") issued by her against Plaintiffs, claiming that its issuance violated Plaintiffs' due process rights under the Fourteenth Amendment of the United States Constitution. The Court held a hearing on Plaintiffs' motion on September 12, 2007, and now rules.

**I.**

On August 15, 2007, the Securities Commissioner issued a Cease and Desist Order against Plaintiffs Andrew H. Williams, POS Dream Home LLC ("POS"), Metropolitan

Grapevine LLC ("Grapevine"), and Laveda Whitfield,[1] after completing an investigation and determining that these individuals and companies had violated the Maryland Securities Act, Title 11, Corporations and Associations Article, Annotated Code of Maryland (1999 Repl. Vol. & Supp. 2006). Specifically, pursuant to her authority under section 11-701.1(a) of the Maryland Securities Act,[2] the Securities Commissioner ordered Plaintiffs to "immediately cease and desist from soliciting investments in, or offering or selling securities or advance-fee investments in or from Maryland, pending a hearing in this matter or until such time as the Commissioner modifies or rescinds this Order."[3] (Compl. Ex. 1, at 2.)

According to the Cease and Desist Order, Plaintiffs began in the fall of 2006 to solicit home owners in Maryland to participate in a mortgage payment program under which home owners pay an advance fee in exchange for POS's promise to pay all mortgage payments and

---

[1] According to the Complaint, Plaintiff Andrew H. Williams is the CEO and sole owner of Plaintiff Grapevine, a company headquartered in Washington, D.C., which, in turn, is the sole owner of Plaintiff POS, with headquarters in Laurel, Maryland. Plaintiff Laveda Whitfield is an employee of an "affiliate office" of Grapevine in Delaware. (Compl., at 3.)

[2] Section 11-701.1(a) provides:

> Whenever the Commissioner determines that a person has engaged or is about to engage in any act or practice constituting a violation of any provision of this title or any rule or order under this title, and that immediate action against such person is in the public interest, the Commissioner may in his discretion issue, without a prior hearing, a summary order directing such person to cease and desist from engaging in such activity provided that the summary cease and desist order gives the person:
>
> (1) Notice of the opportunity for a hearing before the Commissioner to determine whether the summary cease and desist order should be vacated, modified, or entered as final; and
>
> (2) Notice that the summary cease and desist order will be entered as final if such person does not request a hearing within 15 days of receipt of the summary cease and desist order.

Md. Code Ann., Corps. And Ass'ns § 11-701.1(a).

[3] The Cease and Desist Order also directed Plaintiffs to file a written Answer within fifteen days of service of the order "show[ing] cause why a final order should not be issued" against them. (Compl. Ex. 1, at 2, 9.)

pay off the home's entire mortgage, including principal and interest, within five years,[4] at which time POS would receive fifty percent of the equity of the home. Plaintiffs add that, assuming a $500,000 mortgage, the home owner pays a $75,000 advance fee, or fifteen percent of the mortgage, (Pls.' Reply, at 2), meaning that the home owner earns $250,000 in home equity (fifty percent of $500,000) at the end of the five years, equal to a 333 percent return on a five-year investment, even assuming no appreciation of the property.

The Cease and Desist Order also describes a more recently started "Board Membership" program in which POS solicits persons to "lend" $125,000 to $150,000 to the company in exchange for a promise to pay the investor $52,000 per year for five years. Under the programs, Plaintiffs claim to reinvest these advance fees and loans in various business ventures, including "POS Cafes," which are described as kiosks capable of functioning as "an ATM machine, credit card/check reader, touch-n-buy device, and a billboard."[5] (Compl. Ex. 1, at 3.)

The Securities Commissioner concluded in her Cease and Desist Order that (1) the mortgage payment agreements and "Board Membership" program constitute "securities" within the meaning of section 11-101 of the Maryland Securities Act, (2) there is no record of registration in Maryland for an offering by POS, (3) none of the Plaintiffs is registered in

---

[4] At the hearing, Plaintiffs' witness Mr. Michael Hicks, identified as the Chief Financial Officer, as well as counsel for Plaintiffs, stated that the pay-off period was between five and seven years. (Hr'g Tr. 11:13-14, 20:11-12, 25:9-10.)

[5] Mr. Hicks, Chief Financial Officer, testified at the hearing that the "Dream Home program" consists of seven components. (Hr'g Tr. 18:13-14.) Although these seven components were not clearly numbered by him, in reviewing Mr. Hicks's testimony, the Court identifies the following "components": (1) the initial advance fee paid by the home owner, normally in the amount of fifteen percent of the mortgage value (Hr'g Tr. 18:3-16), (2) "the Model Showroom," in which vendors pay a fee to remodel the homes in the program (Hr'g Tr. 18:18-19:6), (3) "Executive Leasing," in which homes are apparently leased to business travelers (Hr'g Tr. 19:6-17), (4) "property management" (Hr'g Tr. 19:18-22), (5) "remodeling and development," including "mid- to high-end condominiums" (Hr'g Tr. 19:23-20:3), (6) the fifty percent equity stake obtained after the mortgages are paid off (Hr'g Tr. 20:4-19), and (7) "POS cafes," including electronic advertising signage (Hr'g Tr. 22:8-15, 32:7-13, 33:3-18).

Maryland as a securities broker-dealer, agent, investment adviser, or investment adviser representative, (4) a 2001 order of the Prince George's County Circuit Court had permanently restrained and enjoined Andrew H. Williams from engaging in securities businesses; and (5) immediate action against Plaintiffs was in the public interest.

Before filing its Complaint and Motion for Temporary Restraining Order with this Court on September 4, 2007, Plaintiffs filed a similar motion with the Securities Commissioner on August 20, 2007, based on the same theory that the August 15 Cease and Desist Order violated their due process rights. (Compl. Ex. 2.)  After receiving an opposition from the Maryland Securities Division and a reply from Plaintiffs, the Securities Commissioner denied the due process motion on September 5 on both statutory and constitutional grounds.  See Line Regarding September 5, 2007 Order by Securities Commissioner of Maryland (Paper No. 4), Ex. 1 ("Order Denying Due Process Claim").  It is also relevant to the due process claims at issue that Plaintiffs requested a ten-day extension of time to answer the Securities Commissioner's Cease and Desist Order on August 28, 2007, and received the full requested extension until September 10, 2007.  (Compl. Ex. 7.)

## II.

In considering Plaintiffs' Motion for Temporary Restraining Order, this Court must first determine whether exercise of its jurisdiction over this matter is proper.  Under Younger v. Harris, 401 U.S. 37 (1971), a federal court must abstain where (1) the requested relief would enjoin an ongoing state judicial proceeding; (2) the ongoing state proceeding implicates important state interests, and (3) the ongoing state proceeding provides an adequate opportunity to present the federal claims.  "Younger is not merely a principle of abstention; rather, the case

sets forth a mandatory rule of equitable restraint, requiring the dismissal of a federal action." Nivens v. Gilchrist, 444 F.3d 237, 247 (4th Cir. 2006). If the Younger elements are met, restraint is demanded "so long as there is no showing of bad faith, harassment, or some extraordinary circumstance that would make abstention inappropriate." Middlesex County Ethics Comm'n v. Garden State Bar Ass'n, 457 U.S. 423, 435 (1982). Finally, although a temporary restraining order, as sought by Plaintiffs here, may be less intrusive than an attack on a final state judgment because it would not actually enjoin the state proceeding itself, such interference nevertheless "raise[s] the specter of a federal pre-judgment," Cinema Blue of Charlotte, Inc. v. Gilchrist, 887 F.2d 49, 53 (4th Cir. 1989), through, for instance, a judgment on the likelihood of success on the merits.

Turning to the first Younger factor, the Commissioner's administrative proceeding, commenced by issuance of the Cease and Desist Order, is a "judicial proceeding" for purposes of Younger. Ohio Civ. Rights Comm'n v. Dayton Christian Sch., 477 U.S. 619, 627 (1986) (observing that it has "applied [Younger] to state administrative proceedings in which important state interests are vindicated, so long as in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate the constitutional claim"). In addition, where, as here, the Securities Commissioner's final order is reviewable in state circuit court, see Md. Code Ann., Corps. & Ass'ns § 11-704; Md. Code Ann., State Gov't § 10-222; Md. Rule 7-202; Md. Code Regs. 02.02.06.24C, a state proceeding is "ongoing" for purposes of Younger "until state appellate review is completed." New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 374 (1989) (Rehnquist, C.J., concurring).

There can be no question regarding the second <u>Younger</u> factor. As the Cease and Desist Order states, the enforcement of Maryland's Securities Act "implicates important state interests in protecting consumers and investors and maintaining a reliable market for the exchange of securities." (Def.'s Opp'n, at 8.) <u>See</u> <u>Hall v. Geiger-Jones Co.</u>, 242 U.S. 539, 550 (1970). The ability of the Commissioner to stop violations quickly is important because "[a] large volume of securities can be sold in a relatively short period of time." <u>Economou v. Wade</u>, 515 F. Supp. 813, 815 (S.D. Iowa 1980).

With respect to the third <u>Younger</u> factor, Plaintiffs have failed to demonstrate that the state administrative proceeding and the availability of state court judicial review are inadequate to evaluate the federal claim at issue. In evaluating the adequacy of the state proceedings, Plaintiffs bear the burden of showing inadequacy or unavailability. <u>Pennzoil Co. v. Texaco, Inc.</u>, 481 U.S. 1, 14 (1987). Under Maryland law, a party may (and, indeed, must) bring a constitutional challenge during an administrative proceeding. <u>Insurance Comm'r v. Equitable Life Assurance Soc'y</u>, 339 Md. 596, 622-23 (1995). In fact, Plaintiffs availed themselves of this opportunity by filing a nearly identical due process claim with the Securities Commissioner on August 20. After receiving an opposition and Plaintiffs' reply, the Securities Commissioner denied Plaintiffs' due process motion on September 5, 2007, by a prompt, thorough, and reasoned order. <u>See</u> Order Denying Due Process Claim. Perhaps most critical, however, is that Plaintiffs did not first attempt to appeal either the Cease and Desist Order–or, for that matter, the later order denying their due process motion–within the Maryland state court system, leaving this Court to predict whether an appeal of the Securities Commissioner's orders is available. <u>See</u> <u>Pennzoil Co.</u>, 481 U.S. at 15 (holding that, "[w]hen a litigant has not attempted to present his

federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary"). While Plaintiffs throw their collective hands up in the air, pointing out that only final orders are appealable under section 11-704 of the Maryland Securities Act, (Pls.' Reply, at 11), the Defendant herself supplies a Maryland Court of Appeals case supporting appellate jurisdiction over orders that impose irreparable injury. See Letter from William F. Brockman (Paper No. 8), at 2 (citing and attaching Holiday Spas v. Montgomery County Human Relations Comm'n, 315 Md. 390, 399 (1989)). See also State Ins. Comm'r v. Nat'l Bureau of Casualty Underwriters, 236 A.2d 282, 286 (Md. 1967) ("If the legislature has not expressly provided for judicial review, a court will ordinarily utilize its inherent powers to prevent illegal, unreasonable, arbitrary or capricious administrative action."); Heaps v. Cobb, 45 A.2d 73, 76 (Md. 1945); Hecht v. Crook, 40 A.2d 673, 677 (Md. 1945). Given these Maryland precedents establishing the inherent right of judicial review and the fact that Maryland state judges are equally bound to enforce the Fourteenth Amendment's Due Process Clause, U.S. Const. Art. VI, Defendants present no persuasive evidence to lead this Court to believe that the Maryland state judiciary is inadequate for addressing the due process claims.[6]

In sum, because (1) Plaintiffs seek to enjoin an ongoing state administrative proceeding that clearly qualifies as "judicial" under Younger, (2) the state proceeding supports the vital state interest in protecting the integrity of securities markets, and (3) Plaintiffs have failed to demonstrate that the state administrative proceeding, along with the availability of judicial

---

[6] Plaintiffs appear to agree wholeheartedly that the Maryland courts are an impartial body, as they have argued vigorously in the administrative proceeding that the Securities Commissioner should seek a temporary restraining order rather than maintain the Cease and Desist Order. (Compl. Ex. 5, at 2.)

review in state court, provides an inadequate opportunity to present their due process claims, this Court declines to exercise jurisdiction over this case at this time, and will, by separate order, dismiss the complaint.

**III.**

Even if the exercise of jurisdiction in this case were proper, this Court concludes that Plaintiffs have also failed to demonstrate that a temporary restraining order is warranted under the factors set forth in Blackwelder Furniture Co. v. Seilig Manufacturing Co., Inc., 550 F.2d 189 (4th Cir. 1977). Under Blackwelder, the Court balances (1) the likelihood of irreparable harm to the plaintiff if the requested relief is denied against (2) the likelihood of harm to the defendant if the relief is granted, while also considering (3) the likelihood that plaintiff will succeed on the merits and (4) the public interest. See Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir. 1991). While the plaintiff always bears "the burden of establishing that each of these factors supports granting the injunction, id., there is a heightened burden where, as here, a party seeks to halt a state's administration of its own laws. See Virginia Surface Mining & Reclamation Ass'n v. Andrus, 604 F.2d 312, 315 (4th Cir. 1979) (noting that the Blackwelder factors "were formulated for private litigation" and that, "'where an injunction . . . will adversely affect a public interest [that a] bond cannot compensate, the court may . . . withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff'" (quoting Yakus v. United States, 321 U.S. 414, 440 (1944))).

### A. *Likelihood of Irreparable Harm to the Plaintiffs if Relief is Denied*

To support their claim that they will suffer irreparable harm if this Court does not grant a temporary restraining order, Plaintiffs point to four affidavits originally filed with the Securities Commissioner as part of their Motion to Dissolve. These affidavits, signed by Plaintiffs Whitfield and Williams, and by Dr. Larry Bland and Rear Admiral O.V. Combs, each state that the Plaintiff companies "are hemorrhaging their business goodwill," that he or she "ha[s] received many inquiries about the meaning of the Summary Order from current or prospective participants in their programs voicing worry and concerns," and that estimated "daily financial loss . . . in lost goodwill and lost new participants . . . is $150,000." Plaintiffs presented testimony from Mr. Michael Hicks, Dr. Bland, and Rear Admiral Combs at the hearing that was consistent with these statements.

Even assuming the truth of these affidavits and the testimony presented, they are insufficient to establish irreparable harm. As to the alleged loss of goodwill, the Court observes that the Cease and Desist Order precludes Plaintiffs only from "soliciting investment in, or offering or selling securities or advance-fee investments in or from Maryland." (Compl. Ex. 1, at 2.) The Securities Commissioner's Order in no way restrains Plaintiffs from generating revenue or cash flow in other ways, such as through its POS Cafes, nor does it restrain the realization of any appreciation in value of the home equity stakes already contractually acquired. In this manner, Plaintiffs are not legally precluded from attempting to fulfill all apparent obligations[7] to current participants in the programs at issue (i.e., those homeowners who have paid an advance

---

[7] Whether the apparent obligations to current participants could ever be fulfilled, even in the absence of regulatory or judicial action, is questionable, at best.

fee and offered a fifty percent equity stake in their homes in exchange for a promise to pay off their mortgages within five years). Thus, to the extent Plaintiffs claim a loss of goodwill among current participants that have inquired about the Cease and Desist Order, the harm is illusory.

To the extent that Plaintiffs claim irreparable harm from the inability to solicit new investors, the $150,000 in claimed "daily losses" must first be discounted substantially in terms of its measure as a true economic loss. Even putting aside for a moment the unsubstantiated nature of the $150,000 figure,[8] this is only a claim of irreparable injury in the form of delayed or foregone capital financing, not a direct claim of lost profits or even lost revenue. Whatever the Securities Commissioner may eventually conclude about the nature of the programs at issue, the Cease and Desist Order effectively prevents Plaintiffs from contractually obtaining current cash assets by incurring massive future liabilities, transactions recorded entirely on the balance sheet of a company and which impact the profits and losses on a company's income statement only indirectly. As such, the measure of consequential economic harm, if any, includes not only the effect on revenue of the foregone cash infusions, but also the savings realized by foregoing additional financial liabilities. See generally 24 Williston on Contracts § 64:1 (4th ed.). Moreover, Plaintiffs are not restrained from obtaining capital financing in any other manner, for

---

[8] Only Dr. Lawrence Bland testified at the hearing specifically regarding the $150,000 figure, stating that Plaintiffs had "concluded" that Plaintiffs were losing "about $150,000 a day" (Hr'g Tr. 37:4-5), but he provided no other support for this conclusion. When pressed by the Court repeatedly to identify the source of this $150,000 per day, Dr. Bland stated that "[t]hese actions have cut into that considerably in terms of those who are participating for the program have a genuine interest." (Hr'g Tr. 42:18-20.) The Court interprets this answer to indicate that the Cease and Desist Order has "cut into" the ability of Plaintiffs to solicit and obtain new participants in the programs under investigation. In answer to further questions from the Court on the source of the $150,000 in losses, Dr. Bland added that "[t]he source of the revenue has come from different vantage points. I'm not quite as clear on certain things myself, because I've only been there a short period of time." (Hr'g Tr. 43:8-11.) When asked directly if the daily loss of $150,000 is from the absence of new investors, Dr. Bland stated that "[i]t was coming from other persons joining the program . . . in addition to rentals we have on some of the properties where we [were] getting some rent" and that it is "partially correct" that the major loss of revenue is the absence of new investors. (Hr'g Tr. 43:15-20, 44:2-4.)

example, by obtaining loans or other financing through a licensed bank or licensed securities dealer. While this Court recognizes that a limitation on a company's ability to obtain additional current financing in exchange for future liabilities–though narrowly tailored as this limitation is–may result in some economic loss in the form of lost revenue and lost profits, Plaintiffs have presented no evidence of such losses or even a reliable explanation for how this limitation on financing has impacted their ability to earn revenue or profits.

Even if delayed or foregone capital financing itself were to qualify as irreparable harm, Plaintiffs have not adequately shown that such losses are substantially attributable to the Cease and Desist Order and, as such, would be remedied by a temporary restraining order. As apparently recognized by Plaintiffs, the publicity that accompanies a high-profile prosecution may adversely affect a company, even without a cease and desist order. (Pls.' Reply, at 9 (urging the Court to "[r]emember how Arthur Anderson (sic) was destroyed after publicity associated it with the Enron Scandal"). Plaintiffs, however, have not moved to restrain the Securities Commissioner in her administrative adjudication of their case and, therefore, this Court does not consider that question. As a result, this Court may not consider any loss of goodwill or other harm attributable to the raising of allegations associated with the mere institution of an administrative proceeding and the concomitant press reports that may have occurred in the absence of a cease and desist order.[9]

---

[9] Indeed, the Virginia State Corporation Commission also issued a temporary restraining order against Plaintiff Andrew Williams and affiliated companies on September 5, 2007, for alleged violations of the Virginia Securities Act and the likely harm and loss that would result if the activities were not enjoined. See Order Granting Temporary Injunction and Scheduling Hearing, Nos. SEC-2007-00061, SEC-2007-00059, SEC-2007-00063, SEC-2007-00064, SEC-2007-00060, and SEC-2007-00065 (Va. State Corp. Comm'n Sept. 5, 2007), available at www.scc.virginia.gov. Any irreparable harm caused by this parallel investigation or temporary restraining order and the resulting press coverage, of course, could not be remedied by a temporary restraining order on the Maryland Securities Commissioner.

As such, the irreparable harm claimed by Plaintiffs is insufficient to justify enjoining this important and vital state proceeding. The Cease and Desist Order, although a limitation on Plaintiffs' business activities, is limited in scope to particular capital financing activities and does not directly impact any of the revenue-generating activities of the companies involved. The Court has received no credible evidence or an explanation as to how this narrow limitation on Plaintiffs' financing activities leads to the alleged lost revenues or lost profits. Moreover, even if this Court were willing to recognize the detrimental impact that such a limitation may have on Plaintiffs, it is not satisfied that such an impact results from the Cease and Desist Order. Rather, it appears to result primarily from the underlying administrative proceeding itself or its resulting press coverage, neither of which is the subject of Plaintiffs' motion.

### *B. Likelihood of Harm to the Defendant and the Public Interest if Relief is Granted*

On the other hand, there is a high probability of substantial harm to the Defendant, or more precisely the investing public whom the Securities Commissioner is charged with protecting. See Md. Code Ann., Corps. & Ass'ns § 11-203(b) (empowering the Securities Commissioner to act where it "is necessary or appropriate for the public interest or for the protection of investors"). As required by Maryland law, Md. Code Ann., Corps & Ass'ns § 11-701.1(a), the Securities Commissioner issued the Cease and Desist Order only after determining "that immediate action against [Plaintiffs was] in the public interest." (Comp. Ex. 1, at 1.) Where, as here, (1) Plaintiff Williams and at least one principal officer of a Plaintiff, Dr. Lawrence Bland, have been permanently restrained from engaging in the sale of securities in the state of Maryland (Compl. Ex. 4, at 4 & Ex. 1 (Consent Order for a Permanent Injunction as to Andrew H. Williams (Feb. 20, 2001)); Def. Hr'g Ex. 2, at 4 (Final Order to Cease and Desist as

to Lawrence D. Bland, Jr. (June 6, 1997))), (2) the instruments in question are not licensed securities, and (3) there is substantial evidence that the ability of Plaintiffs to meet future financial obligations on existing securities is contingent on the ability of Plaintiffs to sell additional securities,[10] this Court will not second-guess the Securities Commissioner's determination that a cease and desist order was and is necessary to protect the public interest. In these circumstances, a temporary restraining order would interfere with vital state securities laws designed to protect the public and stabilize securities markets by ensuring timely and appropriate disclosure of the risks inherent in securities investments.[11]

## *C. Likelihood of Success on the Merits*

Plaintiffs, by their complaint and motion before the Court, seek an injunction against the Securities Commissioner's enforcement of the Cease and Desist Order on grounds that its issuance without prior notice and a hearing violates their due process rights under the Fourteenth Amendment of the United States Constitution. It is apparently uncontested, and this Court agrees, that the Cease and Desist Order, by restraining Plaintiffs from engaging in certain

---

[10] As reviewed already, see supra note 7, no witness was able to specify any sources of the $150,000 in daily losses other than property rentals and new investors, and Dr. Bland admitted when pressed by the Court that it was "partially correct" that the major loss of revenue is the absence of new investors. Dr. Bland also stated that, as a result of the $150,000 in daily losses attributed by Plaintiffs to the Cease and Desist Order, Plaintiffs were "holding on with a string right now." (Hr'g Tr. 42:7-9.) Given these statements, along with the fact that the Cease and Desist Order precludes only the solicitation of new investors and has no effect on Plaintiffs' ability to obtain rental or other income, the Court must conclude that it is at least highly probable that new investors are needed in order for Plaintiffs to meet their future financial obligations. These are, of course, the essential attributes of a classic Ponzi or pyramid scheme.

[11] The general public interest is supported by the fact that Maryland is not alone in entrusting this injunctive power to the Securities Commissioner. The provisions of the Maryland Securities Act bestowing the power to issue cease and desist orders on the Securities Commissioner are substantially the same as those in the Uniform Securities Act of 1985. See 1989 Laws of Maryland, ch. 533. It is noteworthy, therefore, that the cease and desist power, as drafted for the Uniform Securities Act, was a carefully tailored exception applicable to cases involving unregistered securities or unlicensed broker-dealers. See Unif. Securities Act 1985 § 602(a), cmt. 1, 2.

allegedly unlawful business practices, implicates a property interest protected by the Due Process Clause of the Fourteenth Amendment. See Economou v. Wade, 515 F. Supp. 813, 814-15 (S.D. Iowa 1980).

Having determined that due process rights attach, "the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Under Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976), the Court is required to balance three factors in determining what process is due: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the state's interest, including fiscal and administrative burdens that additional procedures would entail. Although Mathews recognized that the "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" 424 U.S. at 333 (citations omitted), the United States Supreme Court explained in a subsequent case that this tenet does not require a hearing prior to deprivation of the constitutionally protected interest:

> An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.

FDIC v. Mallen, 486 U.S. 230, 240 (1988). The Court examines the need for a prior hearing with this guidance in mind.

*(i)     Balancing the Private and Public Interests*

In this case, the Court must weigh the Plaintiffs' interest in engaging in the circumscribed activities against Maryland's interest in protecting the public from sales of securities that allegedly violate the Maryland Securities Act. More specifically, the Court must evaluate the

14

relative impact on these private and public interests of either restraining or allowing the circumscribed activities during the five-week period from August 15, 2007, the effective date of the Cease and Desist Order, until a hearing on the merits that was scheduled before the Securities Commissioner on September 19, 2007.[12]  The parties agree that Economou is the only reported case in which a court has considered the constitutionality of a cease and desist order issued by a state securities administrator without a predeprivation hearing.  Nevertheless, in holding that "the private interests of plaintiffs do not outweigh the States interest in protection of the public," the reasoning of the United States District Court for the Southern District of Idaho is persuasive:

> One detriment of having a hearing prior to the issuance of a cease and desist order is the delay associated with the hearing.  A large amount of securities can exchange hands in a short period of time.  Any delay may benefit the seller of the securities, but may be detrimental to the public.  Furthermore, the Court believes this delay could become a tactic by fraudulent sellers to enable them to continue their activities . . . pending the outcome of a hearing.

Economou, 515 F. Supp. at 816 n.7.

The balance of private and public interests struck by the Economou Court has also been applied in other financial regulatory cases and is equally applicable here.  For instance, Mallen observed that the banking law at issue there was "premised on the congressional finding that prompt suspension of indicted bank officers may be necessary to protect the interest of depositors and to maintain public confidence in our banking institutions."  486 U.S. at 240-41.  The Ninth Circuit has similarly "recognized that the government's interest in protecting bank

---

[12] This period of prehearing deprivation was extended by ten days due to Plaintiffs' requested extension for additional time to answer the show-cause demand in the Cease and Desist Order.  Although the Court recognizes that the failure of a party to diligently avail itself of available administrative procedures may affect the Court's due process analysis, the ultimate question here is whether imposition of injunctive restraints prior to a hearing is constitutionally permitted, even if that hearing must be postponed due to a reasonable and valid request for extension of time by the party whose life, liberty or property is at stake.

15

depositors and the public weal justifies the appointment of a conservator [for a bank] without a prior hearing." First Nat'l Bank & Trust v. Dep't of Treasury, 63 F.3d 894, 896 (9th Cir. 1995); see also Bd. of Governors v. DLG Financial Corp., 29 F.3d 993, 1001 (5th Cir. 1994) (denying a due process claim for lack of predeprivation hearing based in part on its conclusion that "the government has an important interest in maintaining the public confidence in the integrity of financial institutions"). As with banking, any delay in taking immediate action to prevent further potential violations of laws regarding the registration and licensing of securities could result in a crisis in public confidence with broad and devastating effects on the economy.[13]

Under the Maryland Securities Act, as in Economou, the Securities Commissioner has a strong interest in swift enforcement such that the issuance of a cease and desist order without a prior hearing is justified to ensure stability of the securities market. Indeed, Maryland's legislature is not alone in recognizing the need to empower its securities regulator with the ability to immediately enjoin alleged securities violations. The Uniform Securities Act (1985), the model for numerous other state securities laws, similarly provides that the administrator "may issue, without a prior hearing, an order against the person engaged in the prohibited activities, directing the person to desist and refrain from further activity until the security is registered or the person is licensed." Unif. Securities Act 1985 § 602. The comments to section 602 observe that, even at the time of drafting, "[a] large number of state [securities] administrators ha[d] cease and desist authority." Id. at cmt. 1. The comments make clear that this power to impose a cease and desist order without a prior hearing was a purposeful but

---

[13] To the extent the analogy to bank crises is incomplete, the Court notes also that a state's interest in maintaining the integrity of horse racing has even been found sufficient to justify a temporary deprivation of a person's property interest in his trainer's license without a predeprivation hearing. See Barry v. Barchi, 443 U.S. 55, 64 (1979).

16

narrow exception justified for allegations of unregistered securities sales and unlicensed activities where there is a finding of "an immediate danger to the public welfare." See id. at cmt. 2.

*(ii)    The Risk of Erroneous Deprivation and the Value of Additional Procedures*

The Court turns finally to the risk that Plaintiffs' property interests will be erroneously deprived without a predeprivation hearing and the probable value, if any, of reducing this risk through the holding of such a hearing. See Mathews, 424 U.S. at 335. When evaluating this factor, however, the Court must keep in mind the strong state interest at stake here, as discussed above. Where the state interest is sufficiently strong, as it is here, the risk of erroneous deprivation in foregoing a predeprivation hearing is sufficiently minimal if there is "substantial assurance that the deprivation is not baseless or unwarranted." See Mallen, 486 U.S. at 240.

The Cease and Desist Order at issue contains extensive factual averments regarding the terms of the investments offered by Plaintiffs, a specific period during which the investments have been offered, and a detailed description of a specific solicitation by Defendant Whitfield (Compl. Ex. 1 ¶¶ 6-16, 19-21), the essential aspects of which are not disputed by Plaintiffs. Although Plaintiffs make much of the fact that there has been no finding of affirmative fraud on the part of Plaintiffs, such a finding is not necessary to support the Securities Commissioner's conclusion that the financial instruments at issue are unregistered "securities" under Maryland law and that "immediate action" was "in the public interest." Cease and Desist Order, at 1 & ¶¶ 17-18. Given the essentially undisputed underlying facts, the risk of error in concluding that the deals offered were "securities" under Maryland law did not increase significantly by foregoing a

prior hearing, especially given the vital public interest at stake.[14]  Moreover, it is undisputed that (1) Plaintiff POS has no record of a securities registration for an offering; (2) none of the Plaintiffs is properly registered in Maryland to engage in securities offerings; and (3) Plaintiff Andrew Williams, the chief executive officer of both Plaintiffs POS and Metropolitan Grapevine, has been permanently enjoined from engaging in securities businesses.  (Compl. Ex. 1, at 4.)  As such, this Court cannot conclude that there was any significant risk of an erroneous deprivation of property through the procedures used by the Securities Commissioner or that a prior hearing would have lowered this risk sufficiently to justify the palpable risk to the public interest that would have been taken by waiting for a prior hearing.  Indeed, under the facts of this case, and the entirely untenable nature of the astronomical returns promised by the Plaintiffs, anything less than the Cease and Desist Order would have jeopardized the public interest.

**IV.**

In conclusion, this Court declines to exercise jurisdiction because any action it takes would interfere with an ongoing state administrative proceeding that implicates the important

---

[14] Section 11-101(r)(1) defines a "security" under Maryland law as any (i) note; (ii) stock; (iii) treasury stock; (iv) bond; (v) debenture; (vi) evidence of indebtedness; (vii) certificate of interest or participation in any profit-sharing agreement; (viii) collateral-trust certificate; (ix) preorganization certificate or subscription; (x) transferable share; (xi) investment contract; (xii) voting-trust certificate; (xiii) certificate of deposit for a security; (xiv) certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under the title or lease; (xv) in general, any interest or instrument commonly known as a "security"; or (xvi) certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the preceding.  The definition goes on to exclude "any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum, periodically for life, or some other specified period." Md. Code Ann., Corps. & Ass'ns § 11-101(r)(2).

Although this Court need not determine the legal status of Plaintiffs' offerings under Maryland law in order for it to assess the risk of error attributable by foregoing a prior hearing, it is relevant that an "investment contract" under Maryland law is defined largely the same as under federal law, namely as: (1) an investment of money (2) in a common enterprise (3) with an expectation of profits derived solely from the efforts of others.  See Ak's Daks Communications, Inc. v. Maryland Securities Division, 771 A.2d 487, 495 (Md. App. 2001).  It is sufficient to observe that it is far from baseless to conclude that Plaintiffs' offerings fall under this definition.

state interest of regulating and stabilizing the market for securities.  The current administrative proceeding, along with concomitant judicial review available, provide adequate protection of the constitutional rights at issue.  Even if this Court were to exercise jurisdiction, it would deny the motion for temporary restraining order because Plaintiffs have failed to carry their burden under <u>Blackwelder</u>.

For the reasons articulated above, the Court will, by separate order, deny Plaintiffs' motion for temporary restraining order and dismiss the complaint.


<u>September 27, 2007</u>                                          <u>          /s/                    </u>
Date                                                                             Roger W. Titus
                                                                                 United States District Judge